# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2023

Lyle W. Cayce
Clerk

_____

No. 22-50763

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

David Davalos, Sr.,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:16-CR-1115-11

_____

Before Haynes and Engelhardt, *Circuit Judges*, and deGravelles, *District Judge*.[*]

Per Curiam:[**]

Appearing before us again after remand, this sentencing-related case concerns whether the district court: (1) ordered the proper amount of money to be forfeited; and (2) adhered to our previous directives to conform the

_____

[*] United States District Judge for the Middle District of Louisiana, sitting by designation.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-50763

written judgment to the oral sentence. For the reasons set forth below, we AFFIRM in part, REVERSE in part, and RENDER a modified judgment.

## I. Facts and Procedural History

Appellant David Davalos, Sr., was charged with conspiracy to possess with intent to distribute five or more kilograms of cocaine and with the use and maintenance of a premises for the purpose of distributing cocaine. The indictment included, *inter alia*, a notice of demand for forfeiture of certain real property, and a money judgment of $5,980,000 with a provision as to substitute assets.

Davalos pleaded guilty to the charged offenses without a plea agreement. The following offense conduct was set forth in the PSR:[1] Between October 2012 and August 2016, law enforcement agencies investigated the drug trafficking activities of the Genaro Balboa-Falcon Drug Trafficking Organization ("Balboa-Falcon" or "DTO"), which was based in Mexico. The DTO was involved in smuggling kilograms of cocaine from Mexico into the area of Crystal City, Texas. Cocaine distribution took place out of at least three "crack houses" in Crystal City. Davalos operated and maintained one of the "crack houses."

After the cocaine had been distributed and sold from the Crystal City locations, coconspirators would gather the drug proceeds gained from the sales; other coconspirators would transport the proceeds back to Mexico. Nearly 230 kilograms of cocaine were distributed during the duration of the conspiracy (i.e., approximately five kilograms of cocaine each month). Each

---

[1] The factual basis in support of Davalos's guilty plea was similar to the offense conduct detailed in the PSR.

"crack house" sold roughly 1.5 kilograms of cocaine.  Over the course of the conspiracy, the total drug proceeds were equal to nearly $5,980,000.

The district court sentenced Davalos to 235 months of imprisonment on each count of conviction and ordered the prison terms to be served concurrently.  It also sentenced Davalos to five total years of supervised release and imposed certain conditions associated with that supervised release.

In relevant part, the district court imposed a condition requiring Davalos to live in a residential reentry center for six months after his release from prison.  The court stated that it imposed the condition "out of an abundance of caution" because it was uncertain whether Davalos would have a "valid place" to live after he was released.  The court indicated that, if Davalos had a place to live, probation "would file a motion"; the court asserted that it then would "remit" the condition.  The court instructed the probation officer to "put [ ] in [her] chronos" that the condition would be remitted if Davalos "ha[d] a valid residence to go to when he [got] out."  The judgment reflected the imposition of a condition requiring Davalos to live in a residential center for six months but did not state that the condition would be remitted if he had a valid residence to go to following his release from prison.

The district court additionally imposed the standard condition of supervised release providing that, unless Davalos obtained permission from the court, he was prohibited from communicating or interacting with someone whom he knew had been convicted of a felony or was engaged in criminal activity.  The district court orally stated that Davalos was allowed to associate with his son, brothers, nephew and six others who were exempted from the condition.  The written judgment did not set forth the announced

exceptions to the standard condition or name the people with whom the court granted Davalos permission to associate.

In addition to imposing sentence, the district court addressed the forfeiture demand. The court initially pronounced that there was "a money judgment in the case of the amount alleged of [$]5,980,000, but that is joint and several liability." However, the government instructed the court that it only sought a money judgment of $1,794,000. The government referred to *Honeycutt v. United States*, 581 U.S. 443 (2017),[2] wherein the Supreme Court concluded that a defendant is not jointly and severally liable under 21 U.S.C. § 853 for any property that his coconspirator derived from the offense but that he did not acquire himself. The district judge, then, concluded that the amount of the money judgment was $5,980,000 for "everybody combined," but the amount attributable to Davalos alone was $1,794,000. The judgment included a money judgment stating that Davalos must forfeit a sum of money equal to $1,794,000.

Davalos filed an appeal in which he, *inter alia*, challenged the money judgment and alleged that it was inconsistent with *Honeycutt*. *See United States v. Davalos*, 810 F. App'x 268, 272-73 (5th Cir. 2020) ("*Davalos I*"). He argued that the district court failed to make any factual findings as to whether he actually acquired $1,794,000 or other substitute property as a result of the crime. *Id*. at 273. We agreed, *see id.* at 272-73, reasoning that the money judgment lacked sufficient factual support and ordered that it be vacated and remanded for the purpose of making factual findings as to the appropriate money judgment in accordance with *Honeycutt*. *Id*. at 270, 273, 276.

---

[2] *Honeycutt* was decided after the filing of the indictment and before the sentencing hearing.

Moreover, we noted that both parties acknowledged on appeal that there were conflicts between the written judgment and the orally pronounced sentence as to several conditions of supervised release. *Id.* at 275. We identified two conflicts: one with condition regarding Davalos's communication or interaction with persons whom he knew had been convicted of a felony or engaged in criminal activity, the other with the condition regarding the requirement that Davalos live in a residential reentry center for six months after his release from prison. First, we observed that the district court gave permission to associate with specific individuals exempted from the known-felon condition, yet "[t]hat amendment to the standard condition d[id] not appear in the written judgment." *Id.* Second, we explained, despite the court stating that the residential-reentry condition would be "remitted" if he had a "valid residence to go to" after his release from prison, the judgment did not reflect that the condition could be remitted. *Id.* Thus, we reasoned that the case should be remanded to the district court to allow it to conform the judgment to the oral sentence. *Id.* at 270, 274, 276.[3]

Upon remand, the district court entered an order addressing the issues for which the case had been remanded. Again, it ordered a money judgment in the amount of $1,794,000. The district court found that 1.5 kilograms of cocaine were distributed each month through the "crack house" operated by Davalos; the length of time of the conspiracy was 46 months; and the "amount for each kilo was $26,000 per kilo." Accordingly, the district court concluded that "1.5 kilos per month multiplied by 46 months and multiplied by $26,000 totals $1,794,000."

---

[3] The Supreme Court subsequently denied a writ of certiorari. *Davalos v. United States*, 1415 S. Ct. 1518 (2021).

As to the conditions of supervised release, the district court found that an amended judgment was not required. The district court rejected this Court's decision that the orally pronounced conditions conflicted with those in the judgment. Specifically, the district court indicated that its naming of the family members with whom Davalos was permitted to interact was not an "amendment" to the standard condition precluding him from associating with known felons. It explained that it was informing Davalos that he had the court's "permission to interact with [those] family members, as stated in the condition," and noted that it "reserve[d] the right to grant or revoke permission to [the] list in the future." It then stated that, if such permission were granted or revoked, the court could do so via the United States Probation Office or through an order or oral pronouncement on the record.

Further, the district court noted that it did not intend to issue an amended condition as to where Davalos could live after his release. The district court explained that it was merely informing Davalos "of the process to change [the] condition, if necessary," such that an amendment was unnecessary. The court noted that, if Davalos had a place of residence upon his release, "probation will notify the [c]ourt and the condition will be amended at that time."

Davalos timely appealed, raising two issues. First, Davalos argues that the district court's forfeiture order was erroneous and that it should determine an award based on the property Davalos "actually acquired." Second, he argues that the district court erroneously declined to conform the written judgment to its oral pronouncement of sentence, contrary to our dictates in *Davalos I*.

## II. Standards of Review:

We review the district court's findings of fact pertaining to a forfeiture order for clear error, and the question of whether those facts constitute

No. 22-50763

legally proper forfeiture *de novo*. *United States v. Ayika*, 837 F.3d 460, 468 (5th Cir. 2016).

We review *de novo* a district court's application of a remand order, including whether the district court's actions on remand were foreclosed by the law-of-the-case doctrine or the mandate rule. *United States v. Carales-Villalta*, 617 F.3d 342, 343 (5th Cir. 2010).

### III.  Order of Forfeiture:

We first consider Davalos's forfeiture challenge.  Davalos contends that the district court erred because it "did not determine what portion of the $1.794 million was 'actually acquired' by Davalos as directed by Honeycutt." But the district court did not need to identify which portion of the $1.794 million Davalos "actually acquired."

Under 21 U.S.C. § 853, a person convicted of certain drug crimes, like Davalos's crimes, "shall forfeit to the United States … any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation."  21 U.S.C. § 853(a)(1).  "In *Honeycutt*, the Supreme Court read the phrase 'obtained … as the result of such violation' to mean that the defendant himself must 'get' or 'acquire' the tainted property."  *United States v. Moya*, 18 F.4th 480, 484 (5th Cir. 2021) (quoting *Honeycutt*, 581 U.S. at 449).  "This excludes 'joint and several liability' for property obtained not by the defendant but by a co-conspirator." *Id.* (citing *Honeycutt*, 581 U.S. at 449-50); *see also Honeycutt*, 581 U.S. at 453 ("The plain text and structure of § 853 leave no doubt that Congress did not incorporate [the] background principles … [of] conspiracy liability[.]").

"To illustrate its holding, *Honeycutt* posed this hypo[:] A farmer pays a student $300 per month to sell the farmer's marihuana on a college campus; the farmer earns $3 million and the student earns $3,600."  *Moya*, 18 F.4th at 484 (citing *Honeycutt*, 581 U.S. at 448).  "Under § 853(a)(1), the student

would forfeit the $3,600 he 'obtained as a result of' the drug trafficking," "[b]ut not the remaining $2,996,400." *Id.* (citing *Honeycutt*, 581 U.S. at 448-49). "Those tainted proceeds were 'obtained' by the farmer, not the student." *Id.* at 484-85 (citing *Honeycutt*, 581 U.S. at 449-50). "In other words, to make the student forfeit the entire $3 million would impose '[j]oint and several liability,' which 'would represent a departure from § 853(a)'s restriction of forfeiture to tainted property.'" *Id.* at 485 (citing *Honeycutt*, 581 U.S. at 449).

According to Davalos, he is the student in the *Honeycutt* hypo. He concedes that "approximately $1.794 million flowed through [his] crack house." But then, says Davalos, "the $1.794 million flowed south to Balboa-Falcon in Mexico," meaning that the tainted drug proceeds were obtained by Balboa-Falcon, not by Davalos. He argues that because some portion of that tainted money was acquired by Davalos's supplier, holding Davalos liable for the entire $1.794 million would mean that he would have to pay that portion of it from his own untainted assets.

In addition to the *Honeycutt* hypo, Davalos relies on *Moya*. There, we decided that the defendant was not liable for the conspiracy's entire $4 million, when "[t]he evidence show[ed] that Moya [*i.e.*, the defendant] earned up to $1,000 per kilo to distribute [a foreign drug trafficker's] narcotics" and "made roughly $150,000 from these sales, while the rest of the money flowed south to [the foreign drug trafficker]." *Moya*, 18 F.4th at 485. We noted that the foreign drug trafficker "obtained the vast majority of the trafficking proceeds through Moya's efforts," such that the foreigner, "not Moya, obtained those proceeds 'indirectly'" and "Moya obtained only the $150,000 he personally acquired as profit for his trafficking." *Id.* at 485. This, we said, "[was] the *Honeycutt* hypo to a T." *Id.* Because the forfeiture order "ma[de] Moya responsible for drug proceeds that [the foreign drug trafficker] obtained," we vacated the order and remanded the case to the

district court to determine an award based on the property that Moya obtained as a result of the conspiracy." *Id.* at 485-86.

But Davalos's reliance on *Moya* and the *Honeycutt* hypo is misplaced. The central concern in the *Moya* case and the *Honeycutt* hypo was whether Moya or the *Honeycutt* student would be liable for the *total* amount of money gained from the conspiracy: either $4 million (in Moya's case) or $3 million (in the *Honeycutt* student's case). In both *Moya* and *Honeycutt*, the Courts concluded that joint-and-several liability under § 853(a)(1) is impermissible. This Court never decided what portion of the total $4 million – profits or not – Moya needed to forfeit. *Moya*, 18 F.4th at 485-86.

Further, we have already held that a forfeiture order may reach beyond profits. *See United States v. Olguin*, 643 F.3d 384, 399-400 (5th Cir. 2011).[4] In *Olguin*, the defendants argued that the district court erred when it computed the forfeiture amount based upon the gross amount of the conspiracy yielded, and not the net profits. *Id.* at 399. The defendants, however, acknowledged that § 853 forfeiture orders had been traditionally based on gross proceeds. *Id.* Relying on our opinion in *United States v. Fernandez*, 559 F.3d 303 (5th Cir. 2009), we explained that we had previously affirmed a district court's forfeiture order characterizing proceeds as receipts, not profits. *Id.* "When considering the sale of contraband and the operation of a criminal organization," we explained that we previously held in the *Fernandez* case "that the defendant in *Fernandez* could not, on appellate review, render the district court's proceeds-not-profits

---

[4] This Court in *Moya* did not address the *Olguin* case. Moreover, the Supreme Court in Honeycutt made no specific holding about "profits," rather that joint and several liability is impermissible under § 853(a)(1). *Honeycutt*, 581 U.S. at 448. To the extent that *Moya* and *Olguin* conflict, *Olguin* controls. *See Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect.").

characterization of the forfeiture order as plainly erroneous." *Id.* at 400. Accordingly, the *Olguin* defendants' argument failed, and we affirmed "the district court's judgment that the forfeiture order apply to gross receipts, and not simply profits." *Id.*

We also noted that "there is a logical inconsistency in holding that a forfeiture order reaches only profits and not receipts in a context where narcotics are illicitly trafficked for profit." *Id.* "Such a holding," we explained, "would excuse monies spent on the cost of running the conspiracy and the enterprise," like, in the *Olguin* defendants' case, "the cost of renting a U–Haul, the monies spent on the communications apparatus erected to further the enterprise, and any other monies expended to fuel the conspiracy." *Id.* But, we concluded, "the [Comprehensive Forfeiture Act, which includes § 853,] was intended to reach every last dollar that flowed through the criminal's hands in connection with the illicit activity." *Id.* "Were we to hold otherwise, and the [*Olguin* defendants'] arguments embraced, it would essentially mean that criminal defendants have an in-road by which to thwart Congressional intent in wanting to punish parties for their involvement in a criminal enterprise." *Id.*

So, where a forfeiture order should reach "every last dollar that flowed through a criminal's hands," *id.*, we need not remand, as Davalos suggests, for the district court to "determine an award based on the property that Davalos *actually acquired*." Davalos is one trafficker in a scheme of at least three trafficking houses, and it is clear, based off Davalos's own admission, what precise amount of the total operation flowed through his hands, $1,794,000, as opposed to the total $5,980,000. By ordering Davalos to pay only the $1,794,000 – and not the $5,980,000 – the district court applied the central holding in *Honeycutt*: that joint and several liability is not permitted under § 853(a)(1). *Honeycutt*, 581 U.S. at 448. Because the district

court's order reaches all $1.794 million that Davalos concedes "flowed through [his] crack house," we find no error.[5]

## IV. Other Provisions of Sentence:

We next address Davalos's argument that the district court failed to adhere to our previous directives to conform the written judgment to the oral sentence. Davalos maintains that the district court disagreed with this Court's explicit mandates and refused to modify the judgment as directed. And he is correct.

"Under the law of the case doctrine, an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Tollett v. City of Kemah,* 285 F.3d 357, 363 (5th Cir. 2002)). "Without this doctrine, cases would end only when obstinate litigants tire of re-asserting the same arguments over and over again." *Id.* "Moreover, the doctrine discourages opportunistic litigants from appealing repeatedly in hopes of obtaining a more sympathetic panel of this court." *Id.* (citation omitted).

A specific application of the general doctrine of law of the case, the mandate rule, requires a district court to follow "the letter and spirit of the mandate by taking into account the appeals court's opinion and circumstances it embraces." *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006). The mandate rule, however, has three exceptions that, if present, would permit a district court to exceed our mandate on remand: "(1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier

---

[5] The government argues that Davalos waived his forfeiture challenge. Because Davalos's claim fails on the merits, we decline to address the waiver argument.

decision is clearly erroneous and would work a manifest injustice." *Matthews*, 312 F.3d at 657 (citation omitted). We have adopted "a restrictive rule for interpreting the scope of the mandate in the criminal resentencing context." *Id.* at 658.

We expressly determined in Davalos's initial appeal that the written judgment conflicted with the oral pronouncement of sentence as to the two particular conditions of supervised release. *Davalos I*, 810 F. App'x at 275-76. We identified the conditions and detailed the conflicts. *See id.* at 275. In particular, we explained that, while the district court orally modified the standard condition barring Davalos from associating with known felons and named specific persons with whom Davalos could associate, the written judgment did not include that information. *Id.* Likewise, we detailed that, while the district court orally pronounced that the condition requiring Davalos to live in a residential reentry center for six months would be remitted if he had a valid residence to go to after he was released from prison, the judgment omitted that contingency. *Id.* We held that the judgment broadened the restrictions of requirements of supervised release from the oral sentence, concluded that the proper remedy was to remand the case to the district court to amend the judgment to the oral sentence, and ordered that the case be remanded for the district court to conform the judgment to its oral sentence as to the two conditions. *Id.* at 270, 274, 276. We did not leave the district court the option to ignore our order.

The district court did not adhere to our directives. Rather, it rejected our decision that there was a conflict between the judgment and the oral sentence, determining that there only was an "ambiguity." It clarified that the statements excluded from the written judgment were not "amendments." Rather, it explained that it merely: (1) granted Davalos permission to interact with certain family members with respect to the associating-with-known-felons condition; and (2) informed him of the

process to change the residential-reentry condition in the future. The district court, therefore, declined to conform the judgment to the orally pronounced sentence and instead chose to clarify its intentions as to the conditions of supervised release.

By ignoring our holding that there was a conflict and refusing to modify the judgment in accordance with our order, the district court violated the mandate rule. *See Pineiro*, 470 F.3d at 205; *Matthews*, 312 F.3d at 658. *See United States v. Bagley*, 639 F. App'x 231, 232-33 (5th Cir. 2016). But no exception to the mandate rule applies in this instance. *See Matthews*, 312 F.3d at 657 (discussing exceptions).

Appellate courts may "affirm, modify, vacate, set aside or reverse any judgment . . . and may remand the cause and direct the entry of such appropriate judgment." 28 U.S.C. § 2106. We have construed § 2106 to confer discretion on this Court to reform the judgment or to remand for the district court to do so. *United States v. Hermoso*, 484 F. App'x 970, 972-73 (5th Cir. 2012); *see, e.g.*, *United States v. Wheeler*, 322 F.3d 823, 828 (5th Cir. 2003) (remanding to correct judgment in light of conflict); *United States v. Rodriguez-Barajas*, 483 F. App'x 934, 935-36 (5th Cir. 2012) (affirming without remand after modifying the written judgment to excise a special condition of supervised release not orally pronounced). Seeing that the district court did not follow our dictates on remand, we conclude that it is proper to reform the judgment at this juncture.

The two contested conditions of supervised release are modified as follows:

(1) The defendant shall reside in a residential reentry center for a term of Six (6) months. The defendant shall follow the rules and regulations of the center. Should the defendant have a valid place of residence at the time of his release, probation shall notify the Court which shall amend that portion

No. 22-50763

of this order to delete the requirement to reside in a residential reentry. Further, once employed the defendant shall pay 25% of his/her weekly gross as long as it does not exceed the contract rate.

(2) The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the Court. Notwithstanding this condition, the Court permits communication with the following family members: David Davalos, Jr., Jacinto Davalos, Bruce Davalos, Maricela Davalos, Ronald Davalos, and William Davalos. The court retains the right to revoke its permission at any given time as to any of these individuals.

## V.

The district court did not err in calculating the proper forfeiture amount. It did err, however, in failing to follow the mandate of this Court to conform the written judgment to the oral pronouncement of sentence. Accordingly, we AFFIRM in part, REVERSE in part, and RENDER a modified judgment in accordance with this opinion.